**Exhibit A**

# Second Report on the Status of Education Services for Youth Aged 16-21 at Rikers Island[1,2]

Peter E. Leone, Ph.D. Special Master

*Handberry et al., v. Thompson*, 96 Civ. 6161 (GBD) (JCF) December 19, 2017

[1] This report was prepared with the cooperation of the NYC Department of Correction and the NYC Department of Education.
[2] Counsel for plaintiffs and defendants reviewed a draft version of this report issued on Nov. 9, 2017. This version acknowledges and comments on issues raised in response to the earlier draft.

**Executive Summary**

- The NYC Department of Education (DOE) continues to provide education services to inmates at seven correctional facilities operated by the Department of Correction (DOC) on Rikers Island.

- Sixteen and 17 year-old students receive an average of five hours of education services each day.

- Eighteen to 21 year-old students including those placed in restrictive housing do not receive an average of three hours of education services each day.

- Among 18-21 year old inmates, approximately 25 to 30% are enrolled in school but less than half of those enrolled attend school on any given day. Schedule conflicts interfere with school attendance.

- Approximately 40% of the students enrolled in the East River Academy or ERA operated by the NY City Department of Education receive special education services. With the exception of 18-21 year-old students on restrictive housing, inmates eligible for special education services receive instruction and related services specified on their SEPs (Special Education Plans).

- SEPs developed by DOE staff at Rikers Island provide services and supports comparable to the IEPs developed for students prior to their incarceration.

- The DOC and DOE are in substantial compliance with two, and partial compliance with three of the five elements of the Court's March 31, 2016 order.

**Introduction**

This is the second report in response to the order entered by United States District Judge Daniels on March 31, 2016 in *Handberry v. Thompson*. The Court ordered that:

1. *All eligible inmates shall be provided a minimum of 3 hours of educational services every school day.*

2. *Placement in a restricted housing unit does not change an eligible inmate's entitlement to educational services under any provision of this Order.*

3.     *Unless stated explicitly to the contrary, any and all requirements set forth in this Order shall apply to all of the schools, educational programs, and methods of instruction operated by DOE in DOC facilities.*

4.     *DOC shall ensure that each eligible inmate is provided access to educational services consistent with this Order in a timely manner, including if necessary providing escorts for travel to and from his or her place of educational instruction.*

5.     *Inmates who are disabled and identified as in need of special education or related services shall receive such services, including when placed in a restricted housing unit or method of instruction. If necessary, an Individualized Education Plan ("IEP") or Special Education Plan ("SEP") may be modified in accordance with 20 U.S.C. § 1414(d) and 34 C.F.R. § 300.324, consistent with legitimate penal objectives. In the event this occurs, such modifications shall be the least restrictive necessary to accommodate the security needs of the jail.*

The first semi-annual report, issued on February 1, 2017, found the NYC Department of Education (DOE) and the NYC Department of Correction (DOC) in substantial compliance with the provisions of the Court's March 31, 2016 Order. During the past 6 months I visited Rikers Island on March 10, 20, 21, 22 and on June 5 and 6. During these visits, I met with education and custody staff, interviewed students in school and on the living units, and reviewed files. Following my March visits, I requested population, enrollment, and attendance data from the DOE and DOC. I also requested from the DOE, SEPs or Special Education Programs and IEPs or Individualized Education Programs for a random sample of students whose names I selected from a roster of all students receiving special education at Rikers in March 2017.

Following the first report, plaintiffs' counsel raised a number of questions about the adequacy of education services on restrictive units at Rikers, enhanced services and supports, student participation and attendance, and special education services. Many of the questions asked for clarification of methods used for arriving at my conclusions in the February 2017

report.[3] This report responds to many of the questions raised by the plaintiffs' counsel. Following a discussion of the status of compliance with each of the elements of the Court's order, several remaining issues raised by plaintiffs' counsel will be discussed.

On November 9, 2017, I shared a draft version of this report with plaintiffs and defendants' counsel and welcomed their comments. Plaintiffs' counsel had no comments on the November draft of this report. Defendants' counsel wrote to me on November 16, 2017 objecting to what they considered to be incorrect and/or inaccurate statements and conclusions in the draft report.[4] I respond to the defendants' objections and concerns raised in their recent correspondence in the text and footnotes below.

**Status of Compliance**

District 79 of the NYC Department of Education operates the education program at Rikers Island and other DOC facilities in the City. East River Academy (ERA), the school on Rikers Island, serves youth aged 16 to 21. The ERA has classrooms and provides instructional services at seven jails on Rikers Island. Cooperation between the DOC and DOE is essential for inmates eligible for education services offered by the DOE to receive them.

*1.    All eligible inmates shall be provided a minimum of 3 hours of educational services every school day.*

The six days I spent on Rikers Island during my most recent visits indicate that access to education services is highly variable. Evidence shows that 16 and 17 year old inmates receive more than the minimum required hours of service. Sixteen and 17 year-old youth housed at

---

[3] Letter from plaintiffs' attorneys, S. Short, M. L. Werlwas, and D. Lewis to P. Leone, Feb. 17, 2017.
[4] A copy of the letter from Defendants' counsel dated Nov. 16, 2017 is appended to this report.

RNDC attend school on average five hours each day. Consistent with my earlier observations, I found most students in classrooms within 15 to 20 minutes of the scheduled start of the school day. Most students in the classrooms I visited were actively engaged in classroom activities. Data provided by the NYC Department of Education showed that between September 2016 and April 2017 on average 72% and 82% of youth assigned to the main school and the annex respectively at RNDC, attended school. While education is mandatory for 16 and 17 year-old youth, court appearances visits to the infirmary and other activities depressed attendance rates.

For 18-21 year-old inmates on Rikers Island, education is optional. With a few exceptions, most of these youth are placed at EMTC, GMDC, GRVC, NIC, OBCC, and RMSC. Data supplied by the DOE showed that between September, 2016 and April 2017, the average daily attendance for the 18-21 year-olds who enrolled in the East River Academy ranged from a low of 28% at GRVC Secure to a high of 49% at RMSC, the women's facility. During my visits, I observed classrooms and interviewed students and staff on the housing units. For this older group of eligible inmates, the rate of participation is relatively low. On some units, I found conflicts between the school schedule and the recreation time for the unit. On other units, the schedule for I-CAN (Individual Corrections Achievement Network), a re-entry program that focuses on employment and substance abuse issues, conflicted with the school schedule.[5] For example, during my visit to GMDC on June 5, because recreation time for 7U was scheduled in the morning, inmates received a maximum of two, rather than three hours of school each day. I-CAN, scheduled for the afternoon for this unit prevented inmates from attending school after lunch.

---

[5] The NYC DOC asserts that earlier orders issued by the Court in this case as well as NY Education Law acknowledges scheduling conflicts and "does not and cannot mean that the City Defendants have not provided eligible inmates with required educational services." See letter from defendants' attorneys, Nov. 16, 2017.

On other housing units I found inconsistent practices associated with moving students to school. During my June 2017 visits, I found several students on two different housing units not in school. When I checked into the matter, I found that escort staff had incorrectly told unit staff that because of testing, school was not being held that day. Discussion with school staff revealed that was not the case. On other units on GMDC, students reported and my visit to the units confirmed, that students had not been called down to school on the day I visited. I also interviewed several youth who by choice, did not attend school daily. In response to questions about attendance, several students stated that they could only handle school a few days each week and that they preferred to work on their own – or in some cases take a break – on days when they did not attend school.

At GMDC, three units at the time of my March 2017 visits were designated as "success houses." Inmates who expressed a desire to attend school were placed on these units. The idea behind grouping inmates interested in school together is that it can create a culture on the unit that promotes regular attendance, achievement, and course completion. Another jail, EMTC has created individual and group incentives to promote school attendance. Extra breakfast cereal in school, movie nights, popcorn, stipends, and public posting of units' attendance rates have increased attendance according to staff and my review of attendance data.

Table 1 shows the number of student enrolled and the percentage of students enrolled and attending on March 1. Table 2 show the average daily attendance at each site from September 2016 to April 2017.

| Unit & School Site | # Enrolled on 3/1/17 | # present 3/1/17 | Attendance 3/1/17 | # students with IEPs 3/1/17 |
|---|---|---|---|---|
| EMTC* | 35 | 26 | 74 % | 12 |

| | | | | |
|---|---|---|---|---|
| GMDC MAIN* | 79 | 33 | 41 % | 31 |
| GMDC PEACE CENTER* | 72 | 30 | 42% | 34 |
| GRVC SECURE* | 7 | 1 | 14% | 3 |
| OBCC ESH* | 26 | 5 | 19% | 4 |
| RMSC* | 24 | 13 | 54% | 6 |
| RNDC ANNEX** | 55 | 46 | 84% | 22 |
| RNDC MAIN** | 64 | 57 | 89% | 32 |
| **Total, All Sites** | **362** | **211** | **58%** | **144 (40%)** |

*18-21 year olds; ** 16-17 year olds; there were no students at NIC on 3/1/17.

*Table 1. Enrollment and Attendance, Rikers Island, March 1, 2017*

| Facility | % attending |
|---|---|
| EMTC | 45 |
| GMDC Main | 41 |
| GMDC Peace Center | 38 |
| GRVC Secure | 28 |
| NIC | 38 |
| OBCC | 37 |
| RMSC | 49 |
| RNDC Annex | 83 |
| RNDC Main | 72 |
| **ERA Overall** | **48** |

*Table 2: Average Daily Attendance, Sept. 2016 - April 2017, All Sites*

The evidence shows that the DOC and DOE are in partial compliance with this provision.

2. *Placement in a restricted housing unit does not change an eligible inmate's entitlement to educational services under any provision of this Order.*

During my site visits in March and June of 2017, I visited classrooms and living units for inmates on all restrictive units. At RNDC, the facility for 16 and 17 year-olds, in the TRU (Transitional Restorative Unit) the mental observation unit, and those in protective custody units receive education services and attend school in the Annex. Their time in school and services they receive are comparable to those received by other students at RNDC. The presence of additional custody officers in the classrooms is the only difference that a visitor to the academic program in the RNDC Annex would notice.

I found the education services on the restrictive housing units at OBCC minimally adequate during the time period covered by my first report issued in February 2017. During my most recent visits, I found education space on two units in OBCC reorganized from the time of my visits in the fall of 2016; desks have been moved further apart and partial dividers have been removed. There was inadequate space for instruction and the noise levels at times made it impossible for students to learn. The DOE has two teachers, dually certified in special education and content areas, assigned to teach in the ESHU at OBCC. At both GRVC and OBCC, inmates are shackled to rings in the floor and are unable to have physical contact any of the other students in the classroom.

My observation of the instructional space at OBCC and interviews with inmates and educators showed that many individuals were not receiving three hours of education services each day. Students and staff reported that students are not brought to the educational space from their units an hour or more after the nominal start time for classes. Students on 4S also reported being locked out of school for five days at the end of May and beginning of June because of a missing key on the unit. Other students elected to not attend school some days because of a conflict with the recreation schedule; these inmates were required to choose between attending

school and having recreation time out of their cells. At the time of my visit to the unit on June 5th, there were 17 students on the school roster for OBCC; 12 scheduled in the morning and 5 in the afternoon. With only 10 desks available, it is impossible for all inmates on the school roster to receive the minimum number of hours of education services.

At GRVC, the other restrictive housing unit for 18-21 year old inmates, there were five desks in a classroom at the time of my visits in the fall of 2016. One teacher with certification in math and special education teaches on the unit. During the past year, one of the desks has been removed from the classroom and there are now four desks available for students. While the space is more conducive for learning activities than the education space at OBCC, the SHU unit has a maximum capacity of 12 and if all inmates were interested in attending school it would be impossible for them to do so. At the time of my visit, students were receiving education on an individual basis for a maximum of 1.5 hours per student each day.[6]

With the exception of students at RNDC, the jail for 16 and 17 year old inmates, those placed on restrictive housing on OBCC and GRVC do not receive the minimum three hours of education services each day. The evidence shows that the DOC and DOE are in partial compliance with this provision.

3.   **Unless** *stated explicitly to the contrary, any and all requirements set forth in this Order shall apply to all of the schools, educational programs, and methods of instruction operated by DOE in DOC facilities.*

---

[6] The NYC defendants are investigating the inadequate number of desks and the routine of providing inmates only 1.5 hours of class each day on the restricted unit at GRVC.

During my March 21-22 visit this year, there were five inmates aged 18-21 at the NIC, a hospital unit. According to staff, all had indicated that they were not interested in participating in the education program. The DOC also has inmates aged 18-21 in detention centers (borough houses) in Brooklyn, the Bronx, Queens and Manhattan. According to DOC and DOE staff, within 24 hours of placement at these detention centers, inmates are asked if they are interested in receiving education services. Those who indicate that they would like to receive services are transferred to Rikers Island and placed in a jail with access to education services. Between December 1, 2016 and April 1, 2017, thirty-seven inmates from borough detention centers requested school services. Eleven of those inmates who remained in DOC custody were transferred to Rikers Island to attend East River Academy.[7],[8]

When inmates housed at AMKC or any jail on Rikers Island without an education program requests educational services, the DOC policy is to transfer inmates to jails that do have an education program. During orientation DOC provides gives detainees the option of requesting educational services via Form 3503. When inmates at these facilities request services they are transferred to Rikers Island.[9]

DOC and DOE are in substantial compliance with this provision.

**4.** ***DOC shall ensure that each eligible inmate is provided access to educational services consistent with this Order in a timely manner, including if necessary***

---

[7] On April 4, 2017, I requested information about the number of inmates aged 18-21 who were transferred from borough detention centers to Rikers Island for education between Dec. 1, 2016 and April 1, 2017.

[8] In the November 9, 2017 draft of this report, I erroneously reported that I had not received information in response to my April 4, 2017 request for information about transfers and school refusals. That information arrived June 20, 2017. I misplaced it.

[9] For inmates held in the borough houses, choosing to enroll in education moves them away from their families and neighborhoods to Rikers Island. For some, this may be a disincentive to participate in the ERA education program.

> *providing escorts for travel to and from his or her place of educational*
> *instruction.*

The DOC has dedicated escorts to accompany students from living units to the school program areas. My observations, review of "call down lists," discussion with the DOC staff serving as escorts, and interviews with inmates on housing units suggest that access to school is inconsistent. Some correctional officers assigned to the schools, place calls to the housing units before the start of the school day. They inform staff that they will soon be on the units to pick up students for school; for many units this process works as intended and students arrive in the school area within 15 minutes of the scheduled start of the school day. However, as discussed above under the first provision, inmates I interviewed on several different units reported that on some school days, escorts did not come to their units to take them to school or arrived more than an hour after the scheduled start of school. On other units, staff reported incorrectly that school had been cancelled on one of the days I visited when in fact, school was in session.

The evidence shows that the DOC and DOE are in partial compliance on this item.

> **5.** **Inmates who are disabled and identified as in need of special education or**
> **related services shall receive such services, including when placed in a**
> **restricted housing unit or method of instruction. If necessary, an Individualized**
> **Education Plan ("IEP") or Special Education Plan ("SEP") may be modified**
> **in accordance with 20 U.S.C. § 1414(d) and 34 C.F.R. § 300.324, consistent**
> **with legitimate penal objectives. In the event this occurs, such modifications**

*shall be the least restrictive necessary to accommodate the security needs of the jail.*

Of the 366 students enrolled in the ERA on March 1, 2017, 144 or 40% were receiving special education services. This is decline in the number receiving services reported in the February 2017 report.[10] Interviews with staff and a review of files on site suggest that ERA diligently reviews files and interviews inmates for special education eligibility. At intake, all 16 and 17 year-old inmates and 18 to 21 year old inmates who have indicated that that are interested in attending school are interviewed. Using the on-line database, staff determines prior NYC DOE enrollment. The STARS database enables counselors to access transcripts, school history, and special education status for students. Staff requests records from other school districts for youth not previously enrolled in DOE schools. IEPs and related special education documentation are obtained through SESIS, another on-line database.

During my visits, I reviewed SEPs, talked with special education teachers, and observed instruction for students eligible for special education services. I discussed with teachers and counselors their service delivery and students on their rosters. I also interviewed students with SEPs who were receiving special education services in the general population at each of the facilities as well as on the restricted units at RNDC, OBCC, and GRVC. The evidence showed that the process of identifying students and the services provided to students were consistent with the requirements of this provision.

File review. I reviewed 25 SEPs following my visits to Rikers in the fall of 2016.

---

[10] The February 2017 report showed that approximately 50% of all students enrolled in ERA during the 2015-2016 academic year were receiving special education services. The most recent report – 40% enrolled in special education – based on a one-day count - may underestimate the number receiving services over time.

In my February 1, 2017 report I wrote:

> *I reviewed the students' present levels of performance, accommodations and supports, related services, measurable goals, and transition planning. I was most interested determining if the plans showed students receiving services in a range of settings and reviewing which related services were listed for students. I was also interested in the quality of the goal statements and transition plans.*

> *My review of the SEPs showed that the plans described students with a wide range of abilities and needed service. The plans were consistent with the range of services I observed during my site visits. Related services for students included speech and language services as well as individual and small group counseling. Most services called for weekly 40-minute sessions. Several students received both speech and language services and counseling services. Special education instructional services on the SEPs I reviewed were described as "push in" in which teachers and para professional work with students in general education classrooms, "pull out" in which teachers work with students on a one-to-one basis outside of the classroom for one or more instructional periods each week, and special class services.*

As part of the my review during this reporting period, I also reviewed SEPs (Special Education Programs) and IEPs (Individualized Education Programs) for a random sample of 20 students whose names I selected from a roster of all students receiving special education at Rikers in March 2017.[11] All personally identifying information had been redacted on the documents I received from the DOE in April 2017. Nineteen of the 20 students were receiving

---

[11] In their letter of February 17, 2017, plaintiffs' attorneys asked if I had compared SEPs developed by staff at Rikers Island with the IEPs developed for students in community schools prior to their arrival at Rikers.

services; one file sent to me was for a student who had aged out (DOB, 7/15/95) and was no longer eligible for services.

The 19 SEPs were similar to the previously developed IEPs for the students with a couple of exceptions. By design, IEPs contain much more detailed information about prior evaluations, student needs, and transition activities than the SEPs. Both documents contain information about present levels of performance, annual goals, and frequency and intensity of services. For nearly all SEPs, I found comparable instructional in the same academic areas as on the IEPs. On several IEPs I found two goals in reading and math and but only one broader goal on the SEP in each of these area but at the same instructional level. With regard to related services, the random sample of SEPs I reviewed contained nearly identical frequency and intensity of services. For example, for file #3, the student's IEP contained one reading, one writing, two math, and two counseling goals. The SEP for this student contained one reading, one writing, one math, and one social development goal. The related services for this student – 40 minutes of individual counseling once each week, was identical on the IEP and the SEP. On the IEP for this student, the special education services called for FT special education placement with a 15:1 (student:teacher) ratio. The SEP had integrated instructional programming with 1:1 pull-out of the general class five times each week.[12]

The IEP and SEP for student #13 contained similar instructional goals. The IEP called for instruction in a general co-taught class with the support of a paraprofessional and no related services. The SEP specified placement in co-taught classes with special education support in

---

[12] The classes at Rikers typically have from 3-8 students.

science and social studies. The SEP also called for 40 minutes of counseling once each week, a related services not found on the IEP.

The evidence shows that the DOC and DOE are in substantial compliance on this provision.

**Issues Raised by Plaintiffs' Counsel**

In correspondence dated February 17, 2017, plaintiffs' counsel raised a number of issues concerning the status of education services for eligible inmates at Rikers Island and the methods I used to arrive at my conclusions. I believe much of the narrative above clarifies and elaborates upon the methods I use when assessing the status of compliance with the Court's March 31, 2016 order in this case. In the section below, I respond to a few remaining issues not previously discussed.

Education on Restrictive Units. Education services on restrictive units are less than ideal and have deteriorated during this past reporting period. Most concerning from my perspective, is the failure of the DOC staff to consult with the DOE administrators about the structure of the classrooms, potential schedule conflicts, and periods in which entire units were restricted from attending school. To the best of my knowledge and the information provided to me by the DOC, there are two ESH unit at OBCC. I visited the education space on both of these units during my visits. In response to questions about my itinerary and schedule while visiting Rikers, I determine my schedule of activities and units I visit. On more than one occasion during visits earlier this year, I altered my schedule for additional time at specific facilities. At the time of my visits, there were no transgendered students enrolled in education; staff reported that they have

served transgendered youth in the past on Rikers Island but not at the Manhattan Detention Center.

I have concerns about the use of the use of restraints on all students while in school on the restrictive housing units. Absent spending additional time on site, it is difficult to gauge the necessity of restraints on all inmates during school on these specialized units. My experience with similar populations in correctional facilities in Chicago and Los Angeles indicate that with a few exceptions, most students in restrictive housing can attend school without being shackled to the floor or to their desks.[13]

When visiting Rikers, I interview and take notes during nearly every conversation I have with students and staff. Nearly all of my interviews with students are on an individual basis; most all are out of the listening range of correctional staff and educators.[14] I typically begin with general questions about school, their academic interests and aspirations, and the frequency with which they attend school. I'm concerned about in any impediments to regular participation including schedule conflicts and disincentives. While I am interested in individual students' responses, I also listen for patterns in students' responses that may confirm or fail to substantiate my initial impressions, observations. or information I heard from others.

Enhanced Services and Supports. The DOC has piloted specialized housing units on GMDC and EMTC. In addition to housing inmates assigned to school together, staff have provided additional incentives such as morning snacks to students on these units. I believe that

---

[13] See also the Board of Correction's July 2017 report, Assessment of Enhanced Supervision Housing (ESH) for Young Adults. The Board reported that when restraint desks were used in other jurisdictions, they were part of "multi-level step-down programs designed to transition inmates out of punitive segregation or similarly restrictive non-disciplinary segregation and back into general population or the community." This is not the case on the ESH units at Rikers. https://tinyurl.com/y8lmduav

[14] On several occasions, I have asked DOE administrators to sit in on my interviews.

increased use of dedicated housing units will result in greater attendance and participation among students.

Participation and Attendance. For the most part questions about student participation and the location of services were addressed in the main sections of this report. During my next visits I will further examine access to education for young adults at AMKC. I plan to interview individuals on that unit and make an independent determination about their access to education services.

Among 18 to 21 year olds on Rikers Island the rate of participation has improved during the past year but is still well below what one would expect. DOC average daily population data and DOE enrollment reports show that approximately 40% of all 18 to 21 year-old inmates are enrolled in ERA. Of that number, approximately 35-40% attend school on any given day. For all students, court dates and visits to the infirmary suppress attendance. For 18 to 21 year-old students in some housing units, conflicts with commissary and recreation activities interfere with student attendance.

Special Education Services. Questions raised about the methods for reviewing special education services were addressed above.

**Issues Raised by Defendants' Counsel**

In correspondence dated November 16, 2017, Defendants' Counsel from the NYC Law Department disagreed with several of my findings, agreed with one of my findings, and indicated that they would look into several issues and incidents I discussed in the this report. Each of these is briefly discussed below.

1. *All eligible inmates shall be provided a minimum of 3 hours of educational services every school day.*

While I found the defendants in compliance with this provision for 16 and 17 year olds, I found schedule conflicts and inconsistent escort practices merited a partial compliance rating overall. The defendants argued that the Court of Appeals for the Second Circuit vacated paragraph 15 of the original injunction and that schedule conflicts should not be interpreted as failure to find compliance with this provision. Further, the defendants argued that inconsistent escort practices – if they do exist – should not be construed as failure to comply with this provision. In support of this argument defendants cite *Goss v. Lopez* and *Honig v. Doe.*[15] My experience over more than 25 years of monitoring and serving as an expert to the Court in juvenile and adult corrections in a number of states has been that when I visit facilities, staff are diligent in demonstrating that they consistently meet the letter and spirit of a court order, settlement agreement, or consent decree. Presumably, DOC and DOE staff were informed in advance of my visit and made arrangements for access to the jail complex, housing units, and classrooms. If what I observed in facilities serving 18 – 21 year old inmate-students during my visits to Rikers during this reporting period represents the Defendants best efforts to comply, I question the status of services when I am not on site.

I have not reviewed the original injunction in this case nor the appellate court decision vacating paragraph 15 of the original injunction.[16] I will defer to the parties and the Court

---

[15] Cited by Defendants as Goss v. Lopez,419 U.S. 565, 584 (1975); accord, Honig v. Doe, 484 U.S. 305, 325-6, 328-9 (1988) (School district could not change educational placement of student with a disability for more than 10 school days without utilizing IDEA's procedures); 20 U.S.C. $ 1415(k)(1XB) and (C).

[16] Cited by Defendants as Handberry v. Thompson, 446 F.3d 333, 346, 356 (2d Cir. 2006), affirming in part, vacating in part, and vacating and remanding in part, Handberry v. Thompson, 219 F.Supp.2d 525, 547 (S.D.N.Y. 2002)

concerning my interpretation of the Court's March 31, 2016 requirement that inmates receive three hours of education services each day.

2. *Placement in a restricted housing unit does not change an eligible inmate's entitlement to educational services under any provision of this Order.*

While I found the defendants in compliance with this provision for 16 and 17 year old in restricted housing units, I found the defendants not in compliance for 18-21 year old inmates. In finding non-compliance for older eligible inmates I identified among other things, escort and scheduling issues, an incident in which inmates were locked out and prohibited from attending school for a week, a lack of desks on the restricted housing units, and the practice of only allowing inmates to attend school for 1.5 hours each day on one restricted housing unit. These problems and others were also found by the Board of Correction in its July 2017 report, An Assessment of Enhanced Supervision Housing for Young Adults. [17]

3. *Unless stated explicitly to the contrary, any and all requirements set forth in the Order shall apply to all schools, education programs, and methods of instruction by DOE in DOC facilities.*

In my initial draft of this report, I was unable to verify compliance with this provision. The DOC provided me with documentation in June 2017 concerning the status of this provision. This final draft of the Second Report updates and corrects the draft report submitted to and reviewed by the parties in November 2017.

4. *DOC shall ensure that each eligible inmate is provided access to educational services consistent with the Order in a timely manner, including if necessary providing escorts for travel to and from his or her place of educational instruction.*

---

[17] See Board of Corrections July 2017 report, An Assessment of Enhanced Supervision Housing for Young Adults, https://tinyurl.com/y8lmduav

The DOC asserts that occasional problems with escorts for adult eligible inmates "are insufficient, even when aggregated," to justify my finding of partial compliance with this provision. I disagree. As discussed above, I anticipate seeing programs and services at close to their optimal operations when I monitor or evaluate services in jails or prisons. Administrators, supervisors, and line staff have adequate notice of my visits and sufficient opportunity to ensure that variance from a specific provision is minor. My observation, discussion with educators, and my review of the BOC report on ESH housing, suggests that getting inmate students aged 18-21 from their housing units to school on time is a chronic problem. As a consequence, inmates lose hours of instruction each week to which they are entitled.[18]

5. *Inmates who are disabled and identified as in need of special education or related services shall receive such services, including when placed in a restricted housing unit or method of instruction. If necessary, an Individualized Education Plan ("IEP") or Special Education Plan ("SEP") may be modified in accordance with 20 U.S.C. § 1414(d) and 34 C.F.R. § 300.324, consistent with legitimate penal objectives. In the event this occurs, such modifications shall be the least restrictive necessary to accommodate the security needs of the jail.*

I found the Defendants in substantial compliance with this provision; the City agrees.

### Comments

There has been some deterioration in access to services during this reporting period. When students are able to get to school, they receive appropriate services and supports. For those

---

[18] See Board of Corrections July 2017 report, An Assessment of Enhanced Supervision Housing for Young Adults, https://tinyurl.com/y8lmduav

students on restrictive housing units, lack of instructional space and artificial barriers such as DOC staff determining that students only receive 1.5 hours of instruction each day, interfere with compliance with the Court's order. The DOC needs to work with DOE on improving use of the escorts. My observations suggest that they work well on in some facilities but not in others. Greater attention to the use of escorts, eliminating potential schedule conflicts, and the use of designated "school housing" would improve attendance for the 18-21 year-old group of inmates.



THE CITY OF NEW YORK

**ZACHARY W. CARTER**
*Corporation Counsel*

## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**JANICE BIRNBAUM**
jbirnbau@law.nyc.gov
212-356-2085

November 16, 2017

*Via Email*
Peter E. Leone, Ph. D.
University of Maryland
Department of Counseling, Higher Education, and Special Education (CHSE)
3942 Campus Dr. - Benjamin Bldg.
College Park, MD 20742

      Re:    *Handberry v. Thompson*
               96 CV 6161

Dear Dr. Leone:

I have reviewed your Second Report on the Status of Education Services for Youth Aged 16-21 at Rikers Island, dated November 9, 2017 ("Second Report"). It appears that there are a number of incorrect and/or inaccurate statements and conclusions in that report. I have listed below the five provisions on which you are charged with reporting as set out in your report and have outlined City Defendants' concerns.

1. *All eligible inmates shall be provided with a minimum of 3 hours of educational services each school day.*

    You found partial compliance on this provision, finding substantial compliance for adolescent eligible inmates. In regard to adult eligible inmates, you cited scheduling conflicts and inconsistent escort practices on one day in June at two housing units as the basis for concerns as to these inmates.

    a. <u>Scheduling Conflicts</u>: The elimination of all scheduling conflicts is not required here. This issue was already litigated in this case. The Court of Appeals for the Second Circuit vacated paragraph 15 of the original injunction which had required that basic jail services not conflict with the school schedule. The vacated paragraph specifically identified recreation, legal services, religious services, visitation and health services. Hence, the fact that you noted scheduling conflicts with any of these types of services is not a basis for a finding of partial

compliance. *Handberry v. Thompson,* 446 F.3d 333, 346, 356 (2d Cir. 2006), *affirming in part, vacating in part, and vacating and remanding in part, Handberry v. Thompson,* 219 F.Supp.2d 525, 547 (S.D.N.Y. 2002). Moreover, I note that under N.Y. Education Law, a student may be marked absent and his/her attendance excused for a number of reasons including but not limited to required court appearances, personal illness, religious observance, and attendance at health clinics. Since this is permitted at all public schools throughout the state, such excused attendance does not and cannot mean that City Defendants have not provided eligible inmates with required educational services. 8 NYCRR 175.6.

b. <u>Inconsistent Escort Practices</u>: At this point, we are looking into the assertions you made in your report concerning the day of inconsistent escort services that you observed in June 2017. City Defendants neither confirm nor deny the assertions at this juncture. Please be assured that not only do we recognize the importance of timely escorts to allow eligible inmates to access education services, but also we try to the extent feasible to minimize disruptions to school attendance, whether from scheduling conflicts or restrictions on access to school (whether from TSOs or otherwise). However, we also note that the one or two days of inconsistent escort practices on a limited number of housing units noted in the report is insufficient to support a finding of noncompliance as a factual matter. Unless the practice results in more than 10 days of missed schooling, it does not rise to the level of a violation in this case, since plaintiffs' right to educational services is based on their property interest in public education, of which they cannot be deprived without procedural due process (i.e., notice and opportunity to be heard in regard to the deprivation, which generally means suspension or expulsion when applied to public schooling). *Handberry,* 446 F.3d at 352-55. In this case, this right is protected by the 14th Amendment's due process clause. The Supreme Court has ruled that for the deprivation to rise to the level of a 14th Amendment violation, the student must be deprived of school without due process for more than 10 school days. *Goss v. Lopez,* 419 U.S. 565, 584 (1975); *accord, Honig v. Doe,* 484 U.S. 305, 325-6, 328-9 (1988) (School district could not change educational placement of student with a disability for more than 10 school days without utilizing IDEA's procedures); 20 U.S.C. § 1415(k)(1)(B) and (C).

Thus, it is respectfully submitted that your finding of partial compliance on the first provision is unwarranted.

2. *Placement in a restricted housing unit does not change an eligible inmate's entitlement to educational services under any provision of this Order.*

You found partial compliance with this provision finding compliance for adolescent eligible inmates in restricted housing units ("RHUs"), but not for all adult eligible inmates in RHUs. The issues cited for adult eligible inmates in RHUs were: (a) escort issues that caused some to receive less than 3 hours of educational services per school day, (b) the lock-out on unit 4S for 5 school days, (c) scheduling conflicts between school

2

and recreation, (d) an inadequate number of desks to serve all on the OBCC school roster for the morning session, and potentially at the GRVC SHU, and (e) individual instruction at GRVC SHU for 1.5 hours.

    a. <u>Escort issues and scheduling issues:</u> Please see the discussion above in regard to the first provision.

    b. <u>4S lock-out</u>: As noted in the Second Report, unit 4S reported being locked out of school for 5 days at the end of May and beginning of June due to a missing key on the unit. Obviously, City Defendants do not condone this, and we will look into this incident. However, as noted above, only a deprivation of educational services that exceeds 10 school days gives rise to a 14th Amendment violation that is cognizable in this case. Thus the 4S lock-out does not support a finding of noncompliance.

    c. <u>Inadequate number of desks:</u> We are investigating this assertion. However, as you know, school attendance is not compulsory for adult eligible inmates, including those in RHUs. Moreover, the attendance rates that you reported for OBCC ESH and GRVC Secure (the applicable units) were 19% and 14% respectively. Hence, it appears that the number of desks is adequate. This conclusion is further supported by that fact that at OBCC, only 37% of enrolled adult eligible inmates attend school, and at GRVC Secure, only 28% attend. Finally, there has been no reported instance of a school session for these secure units at which the number of desks has been inadequate.

    d. <u>Individual instruction at GRVC for 1.5 hours</u>: We are investigating this assertion.

Thus, with the possible exception of the 1.5 hours, it appears that your finding of partial compliance on the second provision is unwarranted.

3. *Unless stated explicitly to the contrary, any and all requirements set forth in this Order shall apply to all schools, educational programs, and methods of instruction by DOE in DOC facilities.*

In the Second Report, you stated that you were unable to confirm compliance on this provision because you did not receive certain information requested of the City Defendants. I re-forwarded the City Defendants' supplemental response, originally sent on June 20, in which this information was provided. Accordingly, we suggest that this response should be revised.

3

4. *DOC shall ensure that each eligible inmate is provided access to educational services consistent with the Order in a timely manner, including if necessary providing escorts for travel to and from his or her place of educational instruction.*

You found partial compliance. It appears that you found substantial compliance for adolescent eligible inmates, but had concerns that access to school was inconsistent as to adult eligible inmates. It appears that your concerns arise from the same incidents that you cited in regard to provision 1 concerning inconsistent escort practices. In addition, you note that on one day of your visit, staff incorrectly reported that school had been cancelled, when it was in session. As explained above, occasional problems with escorts and the like for adult eligible inmates are insufficient, even when aggregated, to justify a finding of partial compliance with this provision.

5. *Inmates who are disabled and identified as in need of special education or related services shall receive such services, including when placed in a restricted housing unit or method of instruction. If necessary, an Individualized Education Plan ("IEP") or Special Education Plan ("SEP") may be modified in accordance with 20 U.S.C. § 1414(d) and 34 C.F.R. § 300.324, consistent with legitimate penal objectives. In the event this occurs, such modifications shall be the least restrictive necessary to accommodate the security needs of the jail.*

You found the City Defendants in substantial compliance on this provision – a finding with which we agree.

In regard to the additional concerns that you raised at the end of your report, City Defendants agree that they are not part of the compliance issues in this case. However, I write separately to address those concerns. Potential scheduling conflicts and restrictions on attending school (whether from TSOs or otherwise) are unavoidable incidents of jail incarceration. City Defendants recognize the importance of regular school attendance for eligible inmates and to the extent feasible, City Defendants coordinate their activities and school schedules to minimize disincentives and obstacles to school access and participation.

We thank you for your work and insights.

Respectfully,

Janice Birnbaum, Senior Counsel

cc. via email: Plaintiffs' counsel

4